JUDGE BUCHWALD

LAW OFFICE OF FELIX Q. VINLUAN
Felix Q. Vinluan (FV6788)
69-10 Roosevelt Avenue, 2nd Floor
Woodside, NY 11377
Tel. No. 718-478-4488
Fax No. 718-478-4588
*Attorneys for the Plaintiffs*

**12 CIV 8561**

RECEIVED
NOV 2 5 2012
U.S.D.C. S.D. N.Y.
CASHIERS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

ISIDRA B. TUBURAN, ROSALINA D. QUILARIO,
and WENDOLEN O. ALMONTE,

                               *Plaintiffs,*

      - against -

RAINA MASSEY, JERRY SONA, and CARE
WORLDWIDE, INC.,

                               *Defendants.*

Docket No. _____

COMPLAINT
Trial by Jury

-------------------------------------------------------------------x

PLAINTIFFS ISIDRA B. TUBURAN, ROSALINA D. QUILARIO, and

WENDOLEN O. ALMONTE, by undersigned counsel, respectfully allege as follows:

### PRELIMINARY STATEMENT

1.    This action arises out of a scheme by which Defendants defrauded the

Plaintiffs through false representations on immigration visa petitions and other

immigration documents, and perpetuated said fraudulent scheme by threats of deportation

and abuse of the legal process. Plaintiffs, who are nationals of the Philippines, possess at

least a bachelor's degree in the science or medical fields.  Individual and corporate

Defendants induced the Plaintiffs into relying on their representations that they would be

sponsored as H-1B beneficiaries and made employees of corporate Defendant, after they

had collected immigration application fees and/or training fees from Plaintiffs.

1

2.     To induce Plaintiffs to be sponsored as H-1B workers, Defendants falsely told them, among other things, that corporate Defendant, the immigration sponsor, was financially stable and that it had several medical/clinical research positions that it needed to fill.

3.     In reliance upon these and other misrepresentations, Plaintiffs agreed to be sponsored by Defendant Care Worldwide, Inc., and paid the required immigration application fees to initiate the H-1B sponsorship process.   Defendant Raina Massey, acting as chief executive officer or principal officer of Defendant Care Worldwide Inc., knowingly made under oath or knowingly subscribed as true, false statements contained in immigration application forms submitted to the United States Immigration and Citizenship Services and to the U.S. Department of Labor.   Defendants knowingly presented immigration applications containing false statements as to the nature of employment of the immigration beneficiaries as well as to the beneficiaries' salaries and worksite assignments.

4.     Defendants knew at the outset that Plaintiffs would not be employed as clinical/medical researchers, the H-1B positions Plaintiffs were sponsored for, by Defendant Care Worldwide, Inc.   After the US Citizenship and Immigration Services approved the immigration petitions on behalf of the Plaintiffs, Defendants advanced their scheme of defrauding the Plaintiffs by providing them advice that they needed to undergo training before they could start work as clinical or medical researchers and by further requiring them to pay training fees.

5.     Defendants also threatened Plaintiffs that if they did not pay the fees charged to them as training fees, and/or to continue working for Defendants, Defendants

2

would cancel or withdraw their H-1B sponsorships, and that they would be deported to their native country. As a result of this campaign of fraud and coercion, Plaintiffs remained in constant fear of the Defendants and believed they had no choice but to obey their orders and pay the charged fees and/or continue working.

6.      Defendants either made Plaintiffs to work, not as clinical researchers, but as recruiters, or made them to report to the office without giving them any research assignments.      When Plaintiffs complained that they needed to do their work responsibilities as clinical/medical researchers, and/or that they needed to be paid the prevailing wage rates, Defendants threatened that their H-1B petitions could be cancelled or withdrawn and that they could be reported for deportation.

7.      Through their conduct, as detailed below, Defendants conducted or participated, directly or indirectly, in the affairs of an enterprise through a pattern of racketeering activity, and/or conspired to do so, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. sec. 1961 et seq.

8.      As a consequence of Defendants' unlawful conduct of submitting fraudulent visa petitions and other documents and misusing visas procured thereafter, and of Plaintiffs' detrimental reliance on Defendants' misrepresentations, Plaintiffs did not receive the lawful wages and benefits they would have received had their immigration sponsor actually employed them as clinical/medical research associates.  Plaintiffs now seek relief, including actual, punitive and treble damages, along with Plaintiffs' costs in prosecuting this action.

9.      Plaintiffs likewise assert claims under the Trafficking Victims Protection Reauthorization Act (18 U.S.C. §1589 and 18 U.S.C. §1590), and federal labor laws and

common law, to recover Plaintiff's lawful wages and overtime wages, other damages and attorney's fees.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 18 U.S.C. §1595(a), a federal question, this action arising under the Trafficking Victims Protection Act (TVPA); by 18 U.S.C. §1964(c), this action arising under the Racketeering Influenced and Corrupt Organizations Act (RICO); by 29 U.S.C. §216(d), this action arising under the Fair Labor Standards Act (FLSA); by 28 U.S.C. §1337, this action arising under Acts of Congress regulating commerce, and by 28 U.S.C. §1331, this action arising under the U.S. Constitution and federal laws.

11.     This Court has supplemental jurisdiction over the related common law claims asserted herein under the doctrine of pendent jurisdiction and pursuant to 28 U.S.C. §1367.  Supplemental jurisdiction over those claims is appropriate because they arise from the same common nucleus of operative facts from which the federal claims arise.

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.  Venue is proper pursuant to 18 U.,S.C. §1965.

## PARTIES

13.     Plaintiff Isidra B. Tuburan ("Tuburan") is an adult individual residing in Queens County, state of New York.

14.     Plaintiff Rosalina D. Quilario ("Quilario") is an adult individual residing in Nassau County, state of New York.

4

15.     Plaintiff Wendolen O. Almonte ("Almonte") is an adult individual residing in Nassau County, state of New York.

16.     Plaintiffs are nationals of the Philippines.

17.     Each of the Plaintiffs has at least a bachelor's degree. Plaintiff Tuburan has a bachelor's degree in Biology; Plaintiff Quilario, in Pharmacy, and; Plaintiff Almonte, in Nursing.

18.     Defendant Raina Massey (hereinafter, "Massey") is, upon information and belief, the President and Chief Executive Officer, and/or director of Defendant Care Worldwide, Inc.   She is of Indian descent and claims to be both a medical doctor and a doctor in clinical psychology.

19.     Defendant Jerry Sona "(Sona")" is, upon information and belief, a brother of Defendant Massey, and served as eyes and ears of Defendant Massey in the Manhattan office, acting as agent or officer of Defendant Care Worldwide and monitoring the activities of Defendant Care Worldwide employees.

20.     Defendant Care Worldwide, Inc. ("Care Worldwide") is, upon information and belief, a New Jersey corporation registered as a foreign business corporation in the state of New York.   During all times relevant, it did business at 38 West 32nd Street, Suite 405, New York, NY 10001.

21.     Upon information and belief, Defendant Massey owns, manages and supervises Defendant Care Worldwide, which claims to be a clinical research site management company.

22.     Upon information and belief, Defendant Care Worldwide had gross annual revenues of at least $500,000.

23.     At all times relevant to this action, each of the above-named Defendants was an employer of each Plaintiff within the meaning of the Fair Labor Standards Act, 29 U.S.C. §§201 et seq.

24.     At all times relevant to this action, Plaintiffs were "employees" of each Defendant within the meaning of the Fair Labor Standards Act, 29 U.S.C.§§201 et seq.

25.     Upon information and belief, Defendant Massey has power over personnel decisions.

26.     Upon information and belief, Defendant Massey has power over payroll decisions.

27.     Upon information and belief, Defendants have the power to hire and fire employees, establish and pay their wages, set their work schedules and maintain their employment records.

28.     All of the acts alleged in this Complaint were authorized, ordered, and implemented by Defendant Massey and/or her officers, agents, and/or representatives while actively engaged in the management of Care Worldwide's business.

29.     At all times relevant to this action, Plaintiffs were engaged in commerce, the production of goods for commerce, and/or were employed in enterprises engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §§206(a) and 207(a).

30.     At all times relevant to this action, Defendants constituted a unified operation, were under common control for a common business purpose, had employees handling, selling, or otherwise working on goods or materials that have been moved in or

produced for commerce by any person, and had an aggregate annual gross volume of business of at least $500,000.

## STATEMENT OF FACTS

### Defendants' Organizational Structure

31.    Defendant Massey formed and incorporated Defendant Care Worldwide to be her instrument in representing to prospective candidates for H-1B sponsorship as the employer or immigration sponsor.

32.    Defendant Massey represented to prospective candidates for H-1B sponsorship that her company, Defendant Care Worldwide, had many clinical trial projects in both United States and in India, and that it required the services of clinical/medical research associates to work on these projects.

33.    Upon information and belief, Defendant Massey utilized the services of New York-based employment agencies, such as but not limited to Golden Touch Agency and Monarch Agency, as referral sources for candidates of her company's H-1B sponsorship and employment.

34.    Upon information and belief, Defendant Massey utilized unknown individuals to penetrate language and business schools catering to nonimmigrant students, such as but not limited to Micropower Career Institute, where they leaked information about employment opportunities and H-1B sponsorships in and through Defendant Care Worldwide.

35.    Upon information and belief, Defendant Massey contacted several immigration lawyers, such as but not limited to Parkash Sharma ("Sharma"), Ramseyer Awuku ("Awuku"), and Steven Markan ("Markan"), and hired their services to prepare

7

and file H-1B immigration petitions on behalf of Plaintiffs and other H-1B beneficiaries for the positions of Clinical/Medical Research Associates.

36.     Defendant Massey hired the services of several Filipino and Indian individuals to man her company's Manhattan office for the purpose of recruiting other non-immigrants, including but not limited to Filipinos, Indians, and Nepalese, to be offered positions of Clinical/Medical Research Associates, and eventually to be sponsored as H-1B beneficiaries.

37.     Upon information and belief, Defendant Massey was the signatory to the H-1B immigration documents and petitions submitted by her immigration lawyers to the U.S. Department of Labor and to the U.S. Citizenship and Immigration Services, whereby she attested under penalty of perjury that the H-1B beneficiaries would be working for Defendant Care Worldwide as Clinical/Medical Research Associates at a rate at least equal to or greater than the prevailing wage rates.

38.     Defendant Sona monitored the activities of Care Worldwide employees working at the Manhattan office, and upon information and belief, reported their activities to Defendant Massey. Upon information and belief, Defendant Sona was tasked to collect training fees from Indian recruits and to keep the money collected by Defendants.

### Defendants' Recruitment and Employment Practices

39.     Defendant Massey would interview prospective candidates for employment and H-1B sponsorship, and would make the decision whether a candidate qualified for the position of Clinical/Medical Research Associate.

8

40.     After qualifying a candidate, Defendant Massey would require the candidate to shell out and pay what she termed "immigration application fees", which would include USCIS filing fees, immigration lawyer's fees, and credential evaluation fee. These "immigration application fees" would normally be in an amount not less than three thousand five hundred dollars ($3,500).

41.     Under pertinent federal regulations regarding H-1B sponsorships, these "immigration application fees" were not supposed to be paid by H-1B beneficiaries, but were supposed to be costs of the H-1B sponsoring employer.

42.     After receiving the immigration application fees from H-1B candidates, Defendant Massey would not immediately utilize the fees she received for H-1B sponsorship purposes. More often than not, it took her several weeks after receipt of the money before she would ask one of her immigration lawyers to prepare and file the H-1B petition.

43.     There were several occasions when the H-1B petitions that Defendants caused to be filed were either returned by the USCIS or were suspended in processing because the filing fees that were submitted by Defendants were not fully funded by their bank accounts.

44.     Upon information and belief, there were several H-1B candidates who paid the immigration application fees to Defendant Massey, but whose H-1B petitions were never filed at all.

45.     Upon information and belief, there were several H-1B petitions that were approved by the USCIS.

46.    Defendant Massey and/or her office assistants would thereafter contact the H-1B beneficiaries and would require them to undergo training before they could allegedly start their H-1B employment.

47.    Defendants charged their H-1B beneficiaries training fee in an amount not less than three thousand dollars ($3,000).

48.    More often than not, after Defendants have received the training fee from their H-1B beneficiaries, they would advise the beneficiaries that they did not have to attend the training anymore.

## Abuse and Threatened Abuse of the Legal System

49.    When the H-1B beneficiaries demanded to start their H-1B employment, Defendants would initially advise them that there was no work available yet. But when pressed later on as to the actual start date of employment, Defendant Massey would shout at the H-1B beneficiaries, and would even threaten them that she could withdraw or cancel the H-1B petition, and that the H-1B beneficiaries could be deported.

50.    Defendant Massey made these threats even though she and Defendants were clearly violating the H-1B program by not providing the H-1B beneficiaries the promised employment.

51.    Defendant Massey informed Plaintiff Tuburan that if she left Defendant Care World, she would cancel her H-1B visa status, and no other employer could hire her.

52.    Defendant Massey likewise informed Plaintiffs Quilario and Almonte that if they continued complaining about their promised work or the lack thereof, she would cause the cancellation of their H-1B visa status and they could be deported.

10

53.    Plaintiffs were frightened by Defendants' continuous threats, particularly because, as Defendants knew, Plaintiffs were working to pay back the debts they incurred to initially pay Defendants' immigration application fees.

## Threats Regarding Arrest, Detention and Deportation

54.    Defendant Massey made ongoing threats to, and in the presence of, Plaintiffs regarding the arrest, detention and deportation of any H-1B beneficiary-recruit of Defendant Care Worldwide who did not stop complaining about lack of work and improper wages.

55.    Defendant Massey told Plaintiffs that they would be apprehended by Immigration officers, detained, and deported if they left their H-1B sponsor and/or stopped working for Defendants.

## Threats of Litigation

56.    Defendant Massey also told Plaintiffs that Defendants could sue any of them if they violated their sponsorship and employment agreements or if they left their employment.

57.    The threats and other acts of intimidation exercised by Defendants upon Plaintiffs served to ensure Plaintiffs' and other H-1B beneficiaries' fearful conformity to Defendants' abusive working requirements and to prevent Plaintiffs from immediately leaving Defendants.

## Failure to Pay Minimum, Overtime and Promised Wages

58.    Upon information and belief, there were at least around thirty H-1B petitions that were approved by the USCIS, and that almost all of these H-1B beneficiaries were not provided any employment by the Defendants.

59.     There were a few H-1B beneficiaries who were required by Defendants to report to work at their Manhattan office.   These beneficiaries were not given clinical/medical research responsibilities, but were made to perform administrative/office functions and/or telemarketing or recruitment responsibilities.

60.     There were in fact several H-1B beneficiaries who were made to report to the office by Defendants but these beneficiaries were not given any work duties at all. They were simply required to be in the office.

61.     Upon information and belief, none of the H-1B beneficiaries whose H-1B petitions were approved received the prevailing wage rates that were promised to them by Defendants in the immigration documents submitted to the U.S. Department of Labor and to the U.S. Citizenship and Immigration Services.

62.     Upon information and belief, Defendants paid their office employees, including some H-1B beneficiaries, on the basis of some unwritten quota system relating to producing sufficient number of recruits who would actually tender training fees.

63.     Upon information and belief, Defendants did not pay their employees, including H-1B beneficiaries, for the time they caused the employees to report to their Manhattan office.

64.     Defendants failed to pay Plaintiffs the promised federal (H-1B) wages for all hours worked, or for all the hours they were required to report to work, or for all the hours they were supposed to be working.

65.     Defendants failed to pay Plaintiff Tuburan the required overtime premium of one and one half times her regular rate of pay for each hour worked in excess of forty each week.

12

## As to Plaintiff Tuburan

66.     In or about March 2009, Plaintiff Tuburan learned from Monarch Agency, an employment agency located in Manhattan, that there were openings for medical research positions with a company owned and managed by a certain Indian doctor.

67.     On or about March 30, 2009, the owner of Monarch Agency introduced Plaintiff Tuburan to Defendant Massey who required Plaintiff Tuburan to submit her educational credentials and to pay two thousand two hundred seventy dollars ($2,270) as discounted fee for immigration application, lawyer fees and evaluation fees.  This happened at the office of Defendant Massey's immigration lawyer (Sharma) located at 38 West 32nd Street, New York, New York.

68.     Defendant Massey offered Plaintiff Tuburan immigration sponsorship through the H-1B program.  Defendant Massey represented that Plaintiff Tuburan would be sponsored as a Clinical Research Associate, and that she would be paid the prevailing wage rate.

69.     Plaintiff Tuburan loaned money from a friend to be able to pay Defendants the amount of $2,270 being required as immigration sponsorship fees.

70.     More than a month after Plaintiff Tuburan submitted her immigration fees to Defendant Massey, Defendant Massey could not produce any evidence that the H-1B petition had been filed.

71.     Plaintiff Tuburan was advised that Defendant Massey's immigration lawyer (Sharma) did not file the immigration petition.  Thus, upon information and belief, the immigration papers were transferred to another immigration lawyer (Awoku) who filed the H-1B petition in or about the first week of May 2009.

13

72.     Upon information and belief, sometime the last week of April 2009, Defendant Massey caused the filing of a labor condition application (Form ETA 9035) with the U.S. Department of Labor for the position of a Clinical Research Associate.

73.     Upon information and belief, Defendant Massey declared under penalty of perjury that she agreed to comply with the attestations or promises contained in the labor condition application, which include the payment of the rate of forty thousand dollars ($40,000) to the beneficiary of the offered position of Clinical Research Associate.

74.     Upon information and belief, Defendant Care Worldwide, through Defendant Massey, caused the filing of the H-1B nonimmigrant petition (Form I-129) to the Vermont Service Center of the US Citizenship and Immigration Services (USCIS), whereby Defendants, under penalty of perjury, promised to employ Plaintiff Tuburan as a Clinical Research Associate at an annual salary of $40,000.

75.     Upon information and belief, the USCIS approved Defendants' H-1B petition in behalf of Plaintiff Tuburan on or about June 23, 2009.

76.     After Defendants' H-1B petition was approved, Defendant Massey required Plaintiff Tuburan to attend trainings for clinical or medical research at Defendants' offices located at 38 West 32nd Street, 4th Floor, New York, NY, and to pay the training fee of three thousand dollars ($3,000).

77.     Plaintiff Tuburan initially paid Defendants $1,000 for her training fee.

78.     There were twelve other individuals who took the twelve-Saturday training with Plaintiff Tuburan.

79.     During the course of the training, Defendant Massey inquired from Plaintiff Tuburan if the latter knew of any other Filipino-owned employment agency, from which Defendants could secure referrals for beneficiaries of H-1B sponsorships.

80.     Plaintiff Tuburan replied that she could inquire from Golden Touch Agency, an employment agency based in Queens, New York, if it could refer Filipino nurses to be sponsored by Defendant Care Worldwide.

81.     Thereafter, Defendant Massey ordered Plaintiff Tuburan to make presentations to recruits of Golden Touch Agency, so that these recruits could be sponsored as H-1B beneficiaries by Defendant Care Worldwide.

82.     Defendant Massey represented to Plaintiff Tuburan that her company had many job openings for medical researchers in clinical trials she had contracts for in various places. Plaintiff Tuburan believed that she would really work as a medical researcher in clinical trials being put up by Defendants, and that there were several other job openings for said position.

83.     From August through September 2009, Defendant Massey required Plaintiff Tuburan to report daily at Defendants' Manhattan office for her job internship. However, instead of doing medical or clinical research, Plaintiff Tuburan was ordered by Defendants to perform recruitment or telemarketing duties, specifically catering to pharmacists and biotechnologists from India.

84.     Defendants instructed Plaintiff Tuburan to recruit Indian healthcare professionals to man supposedly clinical trials in different Indian states, and to require them to undergo training prior to actual employment. Defendants required each Indian

recruit to pay between twelve thousand to twenty four thousand Indian rupees as training fee, and to remit these payments to Indian bank accounts opened by Defendants.

85.     Defendants assigned Plaintiff Tuburan as Clinical Project Director for the Indian state of Orissa.  Plaintiff Tuburan was made responsible to secure enough applicants from Orissa and its neighboring states.

86.     Plaintiff Tuburan and her co-employees were required to sign daily in the attendance sheets provided by Defendants.

87.     Defendant Massey unilaterally declared that her employees' salaries would depend upon their production vis-à-vis their recruitment quota.  She told Plaintiff and other employees that if they had no recruits, they would receive no salary.

88.     Defendant Massey even produced a written memorandum requiring each employee to acknowledge and sign her policy that an employee's salary would depend upon her recruitment production.  Plaintiff Tuburan refused to sign the memorandum, despite the fact that she was berated by Defendant Massey for her refusal to sign.

89.     At all times relevant, and during her employment with Defendants, Plaintiff Tuburan had to work more than forty hours per work week, to sometimes sixty hours per week, including occasionally on Saturdays, just to be able to recruit enough applicants to be trained by Defendants.

90.     Despite starting working for Defendants in August 2009, Plaintiff Tuburan received her first pay check from Defendants on or about November 4, 2009, and only in the amount of one thousand two hundred fifty dollars ($1,250).

91.     Plaintiff Tuburan complained to Defendants that she should be paid the prevailing wage rate according to their promise to the Department of Labor and to the

16

Immigration Service, as well as to her. Plaintiff Tuburan likewise demanded that she be paid her back wages from the time she started working for Defendants. Defendant Massey however replied that Plaintiff Tuburan should produce more recruits to be able to receive a higher salary.

92.     In fact, Defendant Massey reminded Plaintiff Tuburan that she should be grateful for having been sponsored as an H-1B employee and also threatened her with termination of her H-1B employment and with deportation from the United States.

93.     Plaintiff Tuburan received her second pay check from Defendants on or about November 30, 2009 in the amount of one thousand two hundred sixty nine dollars and forty cents ($1,269.40).

94.     Plaintiff Tuburan again complained to Defendant Massey that she should be paid the prevailing wage rate according to the H-1B documents. Defendant Massey disregarded Plaintiff Tuburan's complaint.

95.     In December 2009, Plaintiff Tuburan did not receive any pay checks from Defendants. Defendants informed Plaintiff Tuburan and other employees that money was sent to employees based in India.

96.     In early January 2010, Plaintiff Tuburan pressed Defendant Massey for her back wages. Defendant Massey gave Plaintiff Tuburan two paycheck stubs and stated that she could not give Plaintiff her pay checks as she did not have money in the bank.

97.     Even while Defendants could not give Plaintiff Tuburan's wages, Defendant Massey instructed Plaintiff Tuburan to continue reporting to work and threatened Plaintiff Tuburan again that she would withdraw her H-1B sponsorship and

would report her to immigration authorities to be deported if she did not continue working for Defendants.

98.    Plaintiff Tuburan knew that other employees in the Manhattan office and in Indian offices were not being paid properly and on time by Defendants.

99.    Plaintiff Tuburan became depressed and did not know what course of action to take. She struggled in deciding whether to continue further working for Defendants without pay, or to lose her immigration status and be deported.

100.    Finally, sometime in January 2010, Plaintiff Tuburan decided to leave Defendants' employment, and joined other former employees in reporting Defendants to law enforcement agencies.

101.    Plaintiff likewise knew, at all times relevant, that Defendant Massey had been representing to their recruits that their H-1B petitions had been filed, after she had received their immigration fees, but that most of these H-1B petitions were not filed.

102.    Plaintiff likewise knew, at all times relevant, that many pay checks issued by Defendants to employees had bounced or had been returned due to insufficient funds.

**As to Plaintiff Quilario**

103.    Sometime in or about August 2009, while studying at the Micropower Career Institute in Manhattan, Plaintiff Quilario learned that Defendant Care Worldwide was hiring and sponsoring qualified applicants for H-1B occupations in medical and drug research.

104.    On or about September 5, 2009, Plaintiff Quilario called up Defendants' Manhattan office and inquired about the H-1B hiring. She was told to present herself for interview.

105.    On or about September 12, 2009, Defendant Massey interviewed Plaintiff Quilario. After reviewing Plaintiff Quilario's educational credentials, Defendant Massey informed Plaintiff Quilario that she qualified to be sponsored as a drug research associate.

106.    Defendant Massey advised Plaintiff Quilario to pay immigration application fees in the amount of six thousand five hundred dollars ($6,500), payable in two installments: (a) $3,500, before the filing of the H-1B petition, and; (b) $3,000, upon approval of the H-1B petition.

107.    Defendant Massey likewise required Plaintiff Quilario to attend the mandatory training to prepare her for the position of a drug research associate, and to pay the training fee of three thousand dollars ($3,000), payable in three equal monthly installments of $1,000 each month.

108.    During the interview, Defendant Massey assured Plaintiff Quilario that Defendant Care Worldwide was a stable company; that it had its main office in India and that it had several branches worldwide; that it employed about 6,000 employees worldwide, with more than 50 working at the Manhattan office, and; that it had secured at least 28 approved H-1B petitions, with many more in the pipeline awaiting USCIS decisions.

109.    Defendant Massey represented to Plaintiff Quilario that she would be sponsored as a Drug Research Associate with an annual salary of fifty three thousand dollars ($53,000) for a full-time position.

110.    On or about September 21, 2009, Plaintiff Quilario took a loan in the amount of $3,500 from a friend and used said amount to pay Defendants the required initial immigration fee of $3,500.

111.   Upon information and belief, sometime in November 2009, Defendant Massey caused the filing of a labor condition application (Form ETA 9035) with the U.S. Department of Labor for the position of a Drug Research Associate.

112.   Upon information and belief, Defendant Massey declared under penalty of perjury that she agreed to comply with the attestations or promises contained in the labor condition application, which include the payment of the rate of fifty three thousand dollars ($53,000) to the beneficiary of the offered position of Drug Research Associate.

113.   Upon information and belief, Defendant Care Worldwide, through Defendant Massey, caused the filing of the H-1B nonimmigrant petition (Form I-129) to the Vermont Service Center of the US Citizenship and Immigration Services (USCIS), whereby Defendants, under penalty of perjury, promised to employ Plaintiff Quilario as a Drug Research Associate at an annual salary of $53,000.

114.   Upon information and belief, the USCIS approved Defendants' H-1B petition in behalf of Plaintiff Quilario on or about January 27, 2010.

115.   On or about February 1, 2010, a male caller from Defendants' Manhattan office called up Plaintiff Quilario to inform her that the H-1B petition filed in her behalf had been approved, and that she should report to Defendants' office and pay the $3,000 training fee.

116.   Plaintiff Quilario explained to the male caller that she could not pay immediately the $3,000 training fee, and that according to her previous understanding with Defendant Massey, she had to pay the training fee in three installments and not in one lump sum payment.

117. A few minutes after the male caller's call, Defendant Massey called Plaintiff Quilario and demanded in a loud voice that she paid the whole amount immediately and threatened to withdraw her H-1B petition that could result in Plaintiff Quilario's deportation.

118. For several days, Defendant Massey kept on calling Plaintiff Quilario and demanded that the latter pay the training fee immediately. Defendant Massey threatened to drop the H-1B petition if Plaintiff Quilario did not pay.

119. Not wanting to become unlawfully present and to be subjected to deportation, Plaintiff Quilario borrowed money again from her friend who lent her two thousand dollars ($2,000). Plaintiff Quilario used this borrowed money to partially pay Defendants the training fee being required.

120. Upon receiving the partial training fee, Defendant Massey informed Plaintiff Quilario that the latter did not have to attend the mandatory training, and that Plaintiff Quilario would have to wait for her call regarding her start date of work as Defendant Massey was still awaiting for paper works from India that would be assigned to Plaintiff Quilario.

121. During the same meeting, Defendant Massey informed Plaintiff Quilario that the latter would only be paid one thousand five hundred dollars ($1,500) per month, and that there would be tax deductions of $1,000 every month, thereby leaving five hundred dollars ($500) as net pay. Moreover, Defendant Massey required Plaintiff Quilario to pay part of her own salary to make it appear she was actually receiving the prevailing wage rate. In effect, the difference between the prevailing monthly wage and

$1,500 would be paid by Plaintiff Quilario to Defendants, who would in turn issue a payroll check that would evidence the correct compensation rate.

122.    Defendant Massey told Plaintiff Quilario that if the latter would not agree to the compensation arrangement, Defendant Massey would withdraw her company's H-1B petition and Plaintiff Quilario would become unlawfully present and be deported.

123.    Defendant Massey even mentioned that Defendants could start her green card process through labor certification if Plaintiff Quilario would agree to pay Defendants five thousand dollars ($5,000) before filing, and another ten thousand dollars ($10,000), six months after Plaintiff would have started working.

124.    Sometime before the end of February 2010, Plaintiff Quilario called up Defendants' Manhattan office and inquired when she would start her work as a drug research associate.

125.    Defendant Massey did not bother to return Plaintiff Quilario's inquiry.

126.    Plaintiff visited Defendant's Manhattan office, but found the office closed. Plaintiff likewise made several phone calls to the office, left messages, but her phone calls and messages were never returned.

127.    Sometime on or about April 1, 2010, Plaintiff Quilario sent an e-mail message to Defendant Massey and requested an update on when she could start working for Defendant Care Worldwide.

128.    On the same day, Defendant Massey replied and ordered Plaintiff to "report to office Monday-Friday 10 am to 5 pm.  x  x  x.  Kindly report at working hours".

129.    On or about April 5, 2010, Plaintiff Quilario received another e-mail message from Defendant Massey requiring her to complete Form I-9 and Form W-4 and to submit the same to the office so that she could start assigning her work.

130.    Starting on April 6, 2010, and every day thereafter until April 9, 2010, Plaintiff Quilario went and reported to Defendants' Manhattan office, but found the office closed.  Plaintiff Quilario, not wanting to lose her immigration status and be deported, stayed in front of or near the doors of Defendant's Manhattan office, waiting for the office to be opened.  Defendants' office did not open.

131.    Having reported for four straight days, from 10 am to 5 pm, to an office that showed no signs of opening, Plaintiff decided not to report on the subsequent days.

132.    However, on or about May 3, 2010, Defendant Massey telephoned Plaintiff Quilario and told her that her job as Drug Research Associate would be available in August or September of that year.

133.    During the telephone conversation, Plaintiff Quilario informed Defendant Massey that she had reported to work as per her instructions starting on April 6, 2010, everyday until April 9, 2010, but that the office was closed.  Plaintiff demanded that she be paid for those four days and all the days that she was benched or not given any work at all.

134.    Defendant Massey replied that Plaintiff should not complain, and that she should simply wait until sometime in August or September 2010 for her job to commence.

135.    August and September 2010 came and went, but Defendants' promise of employment never materialized.  Defendants merely toyed with Plaintiff's feeling of

hope which they eventually mercilessly crashed into despair, causing Plaintiff to suffer emotional distress as a result of the loss of her immigration status and the lack of employment.

### As to Plaintiff Almonte

136.    Sometime late August 2009, Plaintiff Almonte was informed by a friend of hers that there were job opportunities at Defendant Care Worldwide.

137.    Sometime thereafter, Plaintiff Almonte's friend arranged a meeting between Plaintiff Almonte and Defendant Massey at the latter's Manhattan office.

138.    During said meeting, Defendant Massey discussed and offered to Plaintiff Almonte the position of Clinical/Medical Researcher. She told Plaintiff Almonte that the sooner she paid the immigration application fee of three thousand five hundred dollars ($3,500), the sooner she could have the immigration papers prepared.

139.    Plaintiff Almonte borrowed money from relatives and friends in the Philippines and in New York to be able to raise the required $3,500 application fee. She then gave the money to Defendant Massey sometime in September 2009.

140.    Plaintiff Almonte requested to be given a receipt for the $3,500 payment, but Defendant Massey refused, and merely stated that she would provide her with a feedback from the USCIS as soon as a notice was received from the USCIS.

141.    A few weeks later, Defendant Massey's assistant, a certain Angelina Carpio, telephoned Plaintiff Almonte and asked the latter to remit the training fee of three thousand dollars ($3,000), in addition to the $3,500 application fee already paid.

142.    Defendant Massey's assistant told Plaintiff that if she refused to pay the training fee, her H-1B sponsorship would be delayed or be put on hold.

24

143.    Sometime in late October 2009, Plaintiff went to Defendants' Manhattan office and requested that she be given a receipt for the $3,500 application fee that she had paid. Defendant Massey got angry at Plaintiff and shouted at her, saying: "You don't trust me!".

144.    Feeling confused and anxious about the situation, Plaintiff Almonte sought the services of a legal counsel sometime in November 2009 to telephone Defendant Massey and to demand for a confirmation receipt that an H-1B petition had been filed for Plaintiff, or in the alternative, to reimburse Plaintiff the $3,500 application fee.

145.    Defendant Massey agreed to sign a promissory note and asked Plaintiff to come to her office. However, when Plaintiff Almonte went to her office, Defendant Massey shouted at her and threatened her that if and when her H-1B petition gets approved, she could terminate her contract any time as their relationship has become sour due to Plaintiff's securing the services of a lawyer.

146.    It was only in December 2009 when Defendant Massey gave Plaintiff a copy of the USCIS notice of receipt acknowledging its receipt of Defendants' H-1B petition in behalf of Plaintiff Almonte.

147.    Upon information and belief, sometime in December 2009, Defendant Massey caused the filing of a labor condition application (Form ETA 9035) with the U.S. Department of Labor for the position of a Clinical Research Associate.

148.    Upon information and belief, Defendant Massey declared under penalty of perjury that she agreed to comply with the attestations or promises contained in the labor condition application, which include the payment of the rate of forty nine thousand

dollars ($49,000) to the beneficiary of the offered position of Clinical Research Associate.

149.     Upon information and belief, Defendant Care Worldwide, through Defendant Massey, caused the filing of the H-1B nonimmigrant petition (Form I-129) to the Vermont Service Center of the US Citizenship and Immigration Services (USCIS), whereby Defendants, under penalty of perjury, promised to employ Plaintiff Almonte as a Clinical Research Associate at an annual salary of $49,000.

150.     Upon information and belief, the USCIS approved Defendants' H-1B petition in behalf of Plaintiff Almonte on or about March 1, 2010.

151.     Together with two other H-1B beneficiaries whose petitions were likewise approved, Plaintiff Almonte went to Defendants' Manhattan office and inquired when they could start working. Defendant Massey told them to secure first their social security numbers and then return to the office for their assignments.

152.     Sometime in April 2010, Defendant Massey asked Plaintiff Almonte to report to the office once a week. Bewildered by Defendant Massey's request, Plaintiff Almonte inquired why would she report only once a week, and why only from that time, when her H-1B petition had been approved as early as March 1, 2010.

153.     Defendant Massey replied: "It is ok. We can claim you were sick. Honestly, there is no job right now. Maybe in the next few months, when the project is ready to start".

154.     Defendant Massey likewise advised Plaintiff and the two other H-1B beneficiaries that they could work outside her company, but that they would have to give her cash so that she could prepare a pay check for each of them. Each of the H-1B

26

beneficiaries would have to pay not only the taxes due, but also both the employer and employee contributions to social security and Medicare.

155.   Defendant Massey tried to rationalize by stating that if Plaintiff wanted to start the green card process, Defendants could assist her as well.  She further stated that by documenting the proper payment of taxes that were due, Defendant Care Worldwide could prove its ability to sponsor its employees' green card.

156.   Finally, Defendant Massey cautioned Plaintiff and the two other H-1B beneficiaries that their discussion was only among the four of them, and that no one else should know about it.

157.   Suspicious of Defendant Massey's ideas, Plaintiff Almonte sought the opinion of a lawyer who advised her not to continue reporting to work for Defendants anymore.

### Emotional Damages

158.   Plaintiffs suffered emotional distress due to both the Defendants' coercive tactics and Plaintiffs' resulting forced labor.

159.   The emotional effects suffered by Plaintiffs include disrupted sleeping, nightmares, ongoing feelings of fear, difficulty developing trust, anxiety, depression, difficulty concentrating and stress.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION

Racketeer Influenced and Corrupt Organizations Act

18 U.S.C. §1962(c) and 18 U.S.C. §1962(d)

160.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 159 as if set forth fully herein.

161.    Plaintiffs bring this claim against all the Defendants.

162.    Plaintiffs bring this action pursuant to 18 U.S.C. §1964(c).

163.    Plaintiffs are "persons" with standing to sue within the meaning of 18 U.S.C. §1964(c).

164.    Employment agencies used by Defendants such as Monarch Agency and Golden Touch Agency, as well as immigration lawyers whose services were retained by Defendants such as Sharma, Awuku and Markan, together with Defendants Massey, Sona, and Care Worldwide constitute an association-in-fact, and therefore constitute an enterprise (the "RICO Enterprise") within the meaning of 18 U.S.C. §1961(4).

### The RICO Enterprise

165.    The RICO Enterprise is a business relationship between and among employment agencies (Monarch Agency and Golden Touch Agency, among others), immigration lawyers (Sharma, Awuku and Markan, among others), and Defendants Massey, Sona, and Care Worldwide, with the common purpose to profit by recruiting, obtaining, processing and providing H-1B sponsorships to non-immigrant workers to purportedly work in the United States, but with no concrete plans to actually employ them pursuant to their immigration and labor attestations and promises.

166.    The RICO Enterprise is engaged in interstate commerce in that its activities and transactions relating to recruiting, obtaining, processing and providing H-1B sponsorships to non-immigrant workers involved the international and interstate

movement of workers which affects interstate commerce, state and international borders, and frequently requires travel and communications across state and international lines.

167.    Defendants Massey, Sona, and Care Worldwide entered into business relationships with employment agencies to serve as their agents and to recruit prospective candidates for H-1B sponsorship.

168.    Once candidates or recruits were selected by Defendant Massey for H-1B sponsorship, Defendants submitted their credential documents and other identification documents to immigration lawyers chosen by Defendant Massey for processing and filing of the H-1B petitions to the USCIS.

169.    Upon information and belief, Defendant Massey shared a portion of the immigration application fees she collected from H-1B beneficiaries with the employment agency-referral sources.

170.    Upon information and belief, Defendant Massey paid the immigration lawyers she retained to file H-1B petitions from the immigration application fees she collected from the H-1B beneficiaries.

171.    Defendant Massey primarily supervised, directed and controlled the day-to-day operations of Defendant Care Worldwide.

### RICO Defendants' Roles in the Enterprise

172.    Defendant Massey organized Defendant Care Worldwide and served as its Chief Executive Officer and/or principal officer.

173.    Defendant Massey, upon information and belief, entered into or directed her employees to enter into business arrangements with employment agencies as referral sources of candidates or recruits for H-1B sponsorship.

174.    Defendant Massey directly interviewed and offered employment and H-1B sponsorship to non-immigrant recruits.

175.    Defendant Massey represented to prospective candidates for H-1B sponsorship that Defendant Care Worldwide had many clinical research trial positions to fill and that Defendant Care Worldwide would sponsor qualified candidates for H-1B employment.

176.    Defendant Massey collected immigration application fees and training fees from H-1B beneficiary-recruits.

177.    Defendant Sona acted as Defendant Massey's eyes and ears in the Manhattan office, and collected training fees from Indian recruits.

178.    Defendant Sona assisted with the overseeing of the operations of the Enterprise.

179.    Defendant Massey retained the services of several immigration lawyers to draft, prepare, and file H-1B petitions on behalf of non-immigrant beneficiaries of Defendant Care Worldwide.

180.    Upon information and belief, Defendant Care Worldwide employed Defendants Massey and Sona.

181.    Defendants Massey, Sona, and Care Worldwide conducted or participated in, and/or conspired to conduct or participate in, the affairs of the RICO Enterprise through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. §§1962(c) and 1962(d), related by their common purpose to profit by recruiting, obtaining, processing and providing H-1B sponsorships to non-immigrant workers to

purportedly work in the United States, but actually had no concrete plans to employ them pursuant to their immigration and labor attestations and promises.

182. Specifically, Defendants Massey, Sona, and Care Worldwide conducted or participated in, and/or conspired to conduct or participate in, the affairs of the RICO Enterprise by engaging in the following predicate acts of racketeering activity under 18 U.S.C. §1961(1).

   a.  Forced labor in violation of 18 U.S.C. §1589;

   b.  Trafficking in persons for the purpose of forced labor and involuntary servitude in violation of 18 U.S.C §1590;

   c.  Immigration document fraud in violation of 18 U.S.C §1546;

   d.  Mail and wire fraud in sending fraudulent visa applications to the U.S. Department of Labor and to the U.S. Citizenship and Immigration Services in violation of 18 U.S.C §§1341 and 1343, respectively;

   e.  Interstate and foreign travel to further their unlawful scheme in violation of 18 U.S.C §1592.

183. The RICO Enterprise, as well as each RICO Defendant, received monetary benefits from defrauding, exploiting, and trafficking Plaintiffs and other H-1B non-immigrant recruits and beneficiaries. Their benefits were primarily in the form of recruitment fees, immigration application fees, training fees, and increased profits and income.

**Predicate Acts:**

Forced Labor: 18 U.S.C. §1589

31

184.    Defendants Massey, Sona and Care Worldwide willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of forced labor in violation of 18 U.S.C §1589 as discussed in this Complaint.

185.    Defendants Massey, Sona and Care Worldwide conspired to and/or used threats of serious harm and threatened abuse of the legal process to obtain the labor of Plaintiffs and other H-1B beneficiary-recruits.

186.    The RICO Defendants, through their agent and officer, Defendant Massey, caused Plaintiff Tuburan and, upon information and belief, other H-1B beneficiaries, to work excessive hours for unlawfully low or no wages at all, by threatening them with arrest and deportation and/or cancellation or withdrawal of their H-1B status or petitions.

187.    The RICO Defendants, through their agent and officer, Defendant Massey, caused Plaintiffs Quilario and Almonte and, upon information and belief, other H-1B beneficiaries, to report to work at their Manhattan office without any wages at all, by threatening them with cancellation or withdrawal of their H-1B sponsorships and/or arrest and deportation.

188.    These predicate acts of forced labor furthered the common purpose of the RICO Enterprise to profit by recruiting, obtaining and providing H-1B sponsorships to non-immigrant workers to purportedly work in the United States, when in fact the RICO Defendants actually had no concrete plans to employ them pursuant to their immigration and labor attestations and promises.

Trafficking in Persons for the Purpose of Involuntary Servitude:  18 U.S.C. §1590

189. Defendants Massey, Sona and Care Worldwide willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of trafficking in persons for the purpose of involuntary servitude in violation of 18 U.S.C §1590 as discussed in this Complaint.

190. The RICO Defendants, through their agent and officer, Defendant Massey, caused Plaintiffs and, upon information and belief, other H-1B beneficiaries, to borrow or take out loans from other persons to be able to pay to Defendants what the latter had been charging them as immigration application fees and training fees.

191. The RICO Defendants knowingly caused each Plaintiff through their misrepresentations to accept Defendants' offer of sponsorship and employment, thereby undertaking significant debt and foregoing other employment opportunities, even if they knew at the outset that they would not provide them the promised employment.

192. The RICO Defendants knew that Plaintiffs would work for them for low or no wages at all on account of the fact that they held Plaintiff's H-1B sponsorships, and also on the fact that Plaintiffs had incurred significant debts to be sponsored by them.

193. Defendants Massey, Sona and Care Worldwide conspired to and/or used threats of serious harm and threatened abuse of the law or the legal process to obtain the labor and/or continued labor or services of Plaintiffs and other H-1B beneficiary-recruits.

194. The RICO Defendants, in collaboration with certain employment agencies and immigration lawyers, recruited and obtained the services or labor of Plaintiffs and other H-1B beneficiary-recruits for forced labor and involuntary servitude.

195. These predicate acts of trafficking in persons for the purposes of forced labor and involuntary servitude furthered the common purpose of the RICO Enterprise to

profit by recruiting, obtaining and providing H-1B sponsorships to non-immigrant workers to purportedly work in the United States, when in fact the RICO Defendants actually had no concrete plans to employ them pursuant to their immigration and labor attestations and promises.

### Immigration Document Fraud: 18 U.S.C. §1546

196.    Defendants Massey, Sona and Care Worldwide fraudulently obtained approvals of H-1B status for Plaintiffs and other similarly-situated H-1B beneficiary-recruits by knowingly making false claims and statements about the nature and location of the work and the wages to be paid in violation of 18 U.S.C. §1546.  The false claims and statements were made willfully, knowingly and intentionally.

197.    Defendant Care Worldwide, through Defendant Massey, submitted labor condition applications (LCA or Form ETA 9035E), a form that must be submitted to the U.S. Department of Labor in order to secure H-1B workers.  These labor condition applications, signed by Defendant Massey, contained material misrepresentations .

198.    By signing one LCA form in or about April 2009, Defendant Massey certified that one beneficiary would be employed as a Clinical Research Associate at an annual wage rate of forty thousand dollars ($40,000).

199.    By signing another LCA form in or about November 2009, Defendant Massey certified that one beneficiary would be employed as a drug research associate at an annual wage rate of fifty three thousand dollars ($53,000).

200.    By signing another LCA form in or about December 2009, Defendant Massey certified that another beneficiary would be employed as a clinical/medical research associate at an annual wage rate of forty nine thousand dollars ($49,000).

201.    In or about May 2009, November 2009, and December 2009, Defendant Care Worldwide submitted three separate Petitions for Nonimmigrant Workers (Form I-129) to the USCIS, which petitions were signed by Defendant Massey, whereby Defendants certified that Plaintiffs Tuburan, Quilario, and Almonte, would be employed as Clinical/Medical Research Associate or Drug Research Associate at an annual wage rates of $40,000, $53,000 and $49,000, respectively.

202.    Even after the USCIS approved the H-1B petitions, Defendants did not employ Plaintiffs as Clinical/Medical/Drug Research Associates, and did not pay them the prevailing wage rates in accordance with their immigration and labor attestations and promises.

203.    These predicate acts of immigration document fraud furthered the goal of the RICO Enterprise to profit by recruiting, obtaining, and providing H-1B sponsorships to non-immigrant workers to purportedly work in the United States, when in fact the RICO Defendants actually had no concrete plans to employ them pursuant to their immigration and labor attestations and promises.

Mail Fraud: 18 U.S.C. §1341

204.    As set forth in the preceding paragraphs, Defendants fraudulently obtained H-1B visa status for the Plaintiffs. Defendants also made, and/or conspired to make false promises regarding immigration benefits in a scheme calculated to defraud Plaintiffs out of money and to coerce Plaintiffs into commencing or remaining in the employ of Defendants.

205.    Defendants used the mails on numerous occasions during 2009 through 2010 to further these fraudulent schemes.

206.    Upon information and belief, the fraudulent applications for labor condition applications and H-1B visa petitions described in the preceding paragraphs were submitted to the U.S. Department of Labor and to the U.S. Citizenship and Immigration Services by U.S. postal service or by commercial carrier.

207.    These willful, knowing, and intentional acts constitute mail fraud in violation of 18 U.S.C. §1341.

208.    These predicate acts of mail fraud furthered the goal of the RICO Enterprise to increase profits by recruiting, obtaining, and providing H-1B sponsorships to non-immigrant workers to purportedly work in the United States, when in fact the RICO Defendants actually had no concrete plans to employ them pursuant to their immigration and labor attestations and promises.

Wire Fraud: 18 U.S.C. §1343

209.    As set forth in the preceding paragraphs, Defendants fraudulently obtained H-1B visa status for the Plaintiffs.   Defendants also made, and/or conspired to make, false promises regarding immigration benefits in a scheme calculated to defraud Plaintiffs out of money and to coerce Plaintiffs into commencing or remaining in the employ of Defendants.

210.    Defendants used wire communications via telephone, fax, and/or email on numerous occasions from 2009 through 2010 to further these schemes.

211.    These willful, knowing, and intentional acts constitute wire fraud in violation of 18 U.S.C. §1343.

212.    These predicate acts of wire fraud furthered the goal of the RICO Enterprise to increase profits by recruiting, obtaining and providing H-1B sponsorships to

non-immigrant workers to purportedly work in the United States, when in fact the RICO Defendants actually had no concrete plans to employ them pursuant to their immigration and labor attestations and promises.

Unlawful Acts in Support of Racketeering Enterprise through Interstate and Foreign Travel: 18 U.S.C. §1592

213. Upon information and belief, Defendants regularly engaged in, and/or conspired to engage in, interstate and foreign travel to carry on their unlawful activities as set forth above.

214. Upon information and belief, Defendants Massey and Sona repeatedly traveled between the states of New Jersey and New York sometime in 2009 through 2010 to recruit, interview, and train prospective H-1B beneficiary-recruits.

215. Upon information and belief, Defendant Massey conducted in-person interviews with each Plaintiff and other applicants in New York and in New Jersey, and discussed the conditions and terms of their H-1B sponsorship and employment.

216. In 2009 and 2010, Defendant Sona, upon information and belief, traveled several times to India from the United States to collect training fees from Indian recruits.

217. These willful, knowing and intentional acts violate 18 U.S.C. §1592.

218. These predicate acts as discussed above furthered the goal of the RICO Enterprise to increase profits by recruiting, obtaining and providing H-1B sponsorships to non-immigrant workers to purportedly work in the United States, when in fact the RICO Defendants actually had no concrete plans to employ them pursuant to their immigration and labor attestations and promises.

## Pattern of Related Racketeering Acts

37

219. The predicate acts of racketeering activity described above constitute a "pattern of racketeering activity" as defined in 18 U.S.C. §1961(5).

220. The predicate acts were related to the enterprise. In carrying out the common purpose of the RICO Enterprise to profit by recruiting, obtaining and providing H-1B sponsorships to non-immigrant workers to purportedly work in the United States, when in fact the RICO Defendants actually had no concrete plans to employ them pursuant to their immigration and labor attestations and promises, the Defendants in the RICO Enterprise utilized fraudulent recruitment methods and misrepresentation tactics to compel involuntary labor.

221. Defendants in the RICO Enterprise repeatedly and systematically utilized mail fraud, wire fraud, immigration document fraud, and interstate and foreign travel to recruit Plaintiffs and other H-1B beneficiary-recruits and secure H-1B visa status for them to purportedly work in the United States.

222. Once the H-1B petitions were approved, Defendants engaged in additional unlawful conduct, including forced labor, trafficking in persons, and unlawful conduct with respect to improper payment of wages.

223. Defendants engaged in the racketeering activity described in this Complaint repeatedly, beginning as early as 2009 through at least the end of 2010, with respect to approximately one hundred H-1B beneficiary-recruits.

224. Defendants engaged in these acts to obtain Plaintiffs' labor or services and compel Plaintiffs to continue working in exploitative working conditions for unlawfully low or no wages.

225. Defendants in the RICO Enterprise relied on the racketeering acts described in this Complaint to conduct their regular business activities. The above-named Defendants' racketeering acts have similar purposes: to profit from the fraudulent recruitment and forced labor of Plaintiffs and other similarly-situated individuals, and to recruit, obtain, and provide H-1B sponsorships to non-immigrant workers to purportedly work in the United States, when in fact the RICO Defendants actually had no concrete plans to employ them pursuant to their immigration and labor attestations and promises.

226. Defendants' acts have yielded similar results and caused similar injuries to Plaintiffs, including unlawful payment of immigration application fees and training fees, assumption of interest-bearing debt, lost work opportunities, and lost or unpaid wages.

227. As set forth in the preceding paragraphs, the racketeering acts have similar participants: Defendants Massey, Sona and Care Worldwide, with participation from certain employment agencies and immigration lawyers.

228. As set forth in the preceding paragraphs, Defendants directed their racketeering activities at similar victims: non-immigrant workers seeking H-1B sponsorship and employment.

229. Defendants' acts have similar methods of commission, such as common recruitment tactics, relatively consistent practices with respect to collecting payments from Plaintiffs, use of similar employment practices and policies with respect to Plaintiffs, and similar methods of coercion and control of Plaintiffs and other similarly-situated individuals.

**Conspiracy**

230.    Starting approximately around 2009, RICO Defendants devised, implemented, and coordinated a scheme to profit from recruiting, offering and providing H-1B sponsorships to non-immigrant workers with no concrete plans to actually employ them and/or to pay them the offered wage rates.

231.    RICO Defendants conspired to obtain H-1B beneficiary-recruits to purportedly work for Defendant Care Worldwide by filing fraudulent H-1B petitions.

232.    Defendants also conspired to defraud the U.S. government, and to defraud and exploit Filipino, Indian and Nepalese H-1B recruits by using misrepresentations regarding working conditions, and by unlawfully underpaying, or overworking, and/or eventually not providing employment as promised in immigration and labor attestations.

233.    RICO Defendants knowingly agreed to the overall objective of the conspiracy to increase profits by recruiting and exploiting H-1B beneficiary-recruits, and agreed to commit various predicate acts in furtherance of that scheme.

234.    In order to successfully perpetrate their scheme, Defendants utilized and formed relationships with certain employment agencies and immigration lawyers to recruit non-immigrant workers and to prepare their H-1B sponsorship documents.

235.    As evidence of the conspiracy, Defendant Massey, on behalf of Defendant Care Worldwide, filed various fraudulent labor condition applications with the Department of Labor, as well as H-1B petitions with the U.S. Citizenship and Immigration Services starting in 2009.

236.    The conspiracy also required that RICO Defendants underpay and/or overwork the H-1B beneficiaries in order to profit from their labor.

237. As evidence of the conspiracy, Defendant Massey, on behalf of Defendant Care Worldwide, signed paychecks in 2009 for Plaintiff Tuburan and other H-1B beneficiaries that did not reflect full payment of all the hours Plaintiff Tuburan and other H-1B beneficiaries actually worked.

238. As a result of the conspiracy, Defendants have obtained profits through the exploitation of Plaintiffs and other H-1B beneficiary-recruits.

## Injury

239. As a direct and proximate result of RICO Defendants' willful, knowing, and intentional acts discussed in this section, Plaintiffs have suffered injuries including, but not limited to, unlawful payment of immigration application fees, training fees, and other immigration and recruitment-related services; interest on debts assumed by Plaintiffs to pay such fees; lost and unpaid wages, lost employment opportunities; and other pecuniary and/or losses to personal property.

240. Plaintiffs are entitled to an award of damages in an amount to be determined at trial, including treble damages and/or threefold the amount gained from human trafficking, and attorney's fees and costs associated with this action and any other relief deemed appropriate.

## SECOND CAUSE OF ACTION

Trafficking Victims Protection Act of 2003 ("TVPA")

Forced Labor, 18 U.S.C. §1589

241. Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 240 as if set forth fully herein.

242. Plaintiffs bring this claim against all the Defendants.

243.  This claim is brought under 18 U.S.C. §1595 of the Trafficking Victims Protection Act.

244.  Defendants subjected Plaintiffs to forced labor in violation of 18 U.S.C. §1589.

245.  Defendants knowingly provided and obtained Plaintiffs' labor and services by subjecting Plaintiffs to threats of serious harm of themselves and others, including litigation, arrest, detention, deportation by immigration and law enforcement officials, and loss of immigration status, in violation of 18 U.S.C. §1589(2).

246.  By threatening Plaintiffs with litigation, arrest, detention, deportation by immigration and law enforcement officials, and by deceiving Plaintiffs about the terms and conditions of their H-1B visa status, Defendants provided and obtained the labor of Plaintiffs through abuse and threatened abuse of law and the legal process in violation of 18 U.S.C. §1589(3).

247.  Defendants knowingly provided and obtained Plaintiffs' labor and services by using a scheme, plan and pattern intended to cause Plaintiffs to believe that, if they left Defendants' employ, they or another person would suffer serious harm or physical restraint, in violation of 18 U.S.C. §1589(4).

248.  As a result of the above violations, Plaintiffs suffered damages.

249.  Plaintiffs are entitled to compensatory and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorney's fees.

## THIRD CAUSE OF ACTION

Trafficking Victims Protection Act of 2003 ("TVPA")

Trafficking with respect to Involuntary Servitude, 18 U.S.C. §1590

250.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 249 as if set forth fully herein.

251.    Plaintiffs bring this claim against all the Defendants.

252.    This claim is brought under 18 U.S.C. §1595 of the Trafficking Victims Protection Act.

253.    Defendants knowingly recruited, provided or obtained Plaintiffs for the purpose of subjecting them to involuntary servitude in violation of 18 U.S.C. §1590.

254.    Defendants knowingly caused or coerced Plaintiffs to enter into debt in order to raise money and pay them the unlawfully-required immigration application fees and training fees.

255.    Defendants knowingly caused Plaintiffs to remain in their employment for fear that if they left, they would not be able to pay back their indebtedness to persons who lent them money to pay Defendants' fees.

256.    Defendants engaged in acts including, but not limited to, psychological coercion, abuse and threatened abuse of the legal process, and threats of physical force to exact  work or service from the Plaintiffs which the Plaintiffs had not offered voluntarily.

257.    Defendant Sona, at the very least, aided and abetted the imposition of involuntary servitude and/or forced labor by directing, ordering, conspiring to commit, or aiding the imposition of involuntary servitude and/or forced labor.

258.    As a result of the above violations, Plaintiffs suffered damages.

259. Plaintiffs are entitled to compensatory and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorney's fees.

## FOURTH CAUSE OF ACTION

Fair Labor Standards Act ("FLSA")

29 U.S.C. §§201 et seq.

260. Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 259 as if set forth fully herein.

261. Plaintiffs bring this claim against all Defendants.

262. This claim is brought under 29 U.S.C. §216(b).

263. Defendants violated 29 U.S.C. §206(b) by failing to pay Plaintiffs the applicable federal minimum wage for all hours worked.

264. Plaintiff Tuburan worked in excess of forty (40) hours per week in one or more weeks during her employment with the Defendants.

265. During a typical or average workweek when Defendants required Plaintiffs to report to the office, each Plaintiff would be given an 8-hour work shift that would start, by way of example, at 10:00 a.m. and would end at 5:00 p.m.. In the case of Plaintiff Tuburan, Defendants required her to extend her work hours, such that the total number of work hours for a given work week would exceed forty (40) hours.

266. Plaintiff Tuburan was and has been entitled to premium compensation at one and one-half times the regular hourly rate ("overtime compensation") for those hours.

267. Defendants violated 29 U.S.C. §207 by failing to pay Plaintiff Tuburan for all hours worked in excess of forty each week.

268.    Defendants failed to pay Plaintiffs for each hour of work that they performed, or that they made themselves available to work for Defendants.

269.    Defendants' failure to pay Plaintiffs their federally-mandated minimum and overtime wages were willful violations of the FLSA within the meaning of 29 U.S.C. §255(a).

270.    Defendants either knowingly violated the FLSA or disregarded the very possibility that they were violating the FLSA.    Defendants were aware of the FLSA's requirements but failed to take the necessary affirmative actions to comply with these requirements.

271.    As a result of the above violations, Plaintiffs suffered damages.

272.    Plaintiffs are entitled to an award of their unpaid minimum and overtime wages, plus an equal amount in liquidated damages, reasonable attorney's fees and costs.

## FIFTH CAUSE OF ACTION

### Breach of Contract

273.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 272 as if set forth fully herein.

274.    Defendants, through their agents, employees, officers, and/or representatives, offered and Plaintiffs accepted, to obtain and maintain their immigration status, and to provide full-time employment at government-approved rates.

275.    Plaintiffs paid substantial sums of money, and entered into interest-bearing debts, surrendered other employment opportunities, incurred other financial losses, and performed work for Defendants and/or made themselves available or were suffered to work or wait for work for Defendants.

45

276.   Plaintiffs performed all of the conditions, covenants and promises in accordance with the terms and conditions of their agreements.

277.   Defendants failed to comply with their obligations under the contractually-binding agreements entered into with the Plaintiffs.

278.   As a direct result of Defendants' breach, Plaintiffs suffered and continue to suffer damages.

279.   Plaintiffs are entitled to recover any and all damages available to them in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Fraudulent Inducement

280.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 279 as if set forth fully herein.

281.   Defendants knowingly made continuing misrepresentations and material omissions of fact, which were false to Plaintiffs regarding the (a) nature of their immigration sponsorship, (b) Plaintiffs' employment, work responsibilities and compensation to the effect that each would be paid in accordance with laws of the United States, as well as the (c) financial state of Defendant Care Worldwide in relation to its immigration sponsorship of the Plaintiffs.

282.   The representations and substantive omissions by Defendants, as alleged herein, including the nature of work and compensation rate of each of the Plaintiffs, were material and untrue.

283.   Defendants made or caused to be made the material misrepresentations and omissions identified above with knowledge or belief of their falsity or with reckless disregard for their truth.

284.   Defendants made or caused to be made the material misrepresentations and omissions with the intent to induce the Plaintiffs to rely upon them so they would agree to be sponsored by Defendant Care Worldwide and to work for or continue to work for Defendants at compensation rates much less than required by law.

285.   In justifiable reliance on the material misrepresentations and omissions made or caused to be made by Defendants, Plaintiffs agreed to be sponsored by Defendant Care Worldwide and to work for Defendants.

286.   Had Plaintiffs known of the material misrepresentations and omissions made or caused to be made by Defendants, Plaintiffs would have not allowed themselves to be sponsored by Defendants through the immigration process and would have not paid the immigration application fees and training fees.

287.   Because of Defendants' abuse of their position of trust as Plaintiff's immigration sponsor, Plaintiffs, even in the exercise of reasonable due diligence, were ignorant of the true facts concerning the nature of their H-1B sponsorship and employment, and believed that Defendants were conducting themselves honestly and properly with each of them.   Plaintiffs accordingly relied upon Defendants' conduct, and acted in such reliance as described above, all to their injury.

288.   Defendants' behavior constitutes an intentional fraud.

289.   As a direct and proximate result of Defendants' acts, Plaintiffs have been damaged in an amount to be determined at trial, but which amount is believed to be no less than one million dollars.

290.   The foregoing acts and omissions by Defendants constitute oppressive, malicious, and deceptive conduct justifying an award to Plaintiff of punitive and exemplary damages, attorney's fees and costs.

## SEVENTH CAUSE OF ACTION

### Negligent Misrepresentation

291.   Plaintiffs hereby refer to and incorporate each and every allegation set forth in paragraphs 1 through 290 of this Complaint as though fully set forth herein.

292.   Defendants, and each of them, being not only the employer of, but the immigration sponsor of the Plaintiffs, had a duty to give correct information to each of the Plaintiffs.

293.   Defendants made false representations to Plaintiffs, as stated above, that each of them knew or should have known was incorrect or false.

294.   Defendants knew that the information supplied in their representations, particularly with regard to the terms and conditions of Plaintiffs' employment, and more especially, with regard to the offered wage rates, was desired by the Plaintiffs for the serious purpose of their maintaining their nonimmigrant status and obtaining their H-1B status in the United States.

295.   Defendants showed willful, conscious, wanton and reckless disregard for Plaintiffs' rights and for the deleterious consequences and unjust hardship placed upon

Plaintiffs as a result of the representations of Defendants and their agents, employees and/or representatives.

296. Plaintiffs intended to rely and act upon the information supplied in Defendants' representations.

297. Plaintiffs reasonably relied upon Defendants' misrepresentations, to their detriment.

298. As a direct and proximate result of Defendants' acts, Plaintiffs have been damaged in an amount to be determined at trial, but which amount is believed to be no less than one million dollars.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

1. Declaratory and injunctive relief;

2. Compensatory damages;

3. Punitive damages;

4. Treble damages as authorized by RICO, 18 U.S.C. §1964(c);

5. Liquidated damages as authorized by FLSA, 29 U.S.C. §216;

6. Attorneys' fees and costs;

7. Such other relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on each and every claim set forth herein.

Dated: Woodside, New York.
November 24, 2012.

Yours, etc.

LAW OFFICE OF FELIX Q. VINLUAN

By:

Felix Q. Vinluan (FV6788)
69-10 Roosevelt Avenue, 2nd Floor
Woodside, NY 11377
Tel. No. 718-478-4488
Fax No. 718-478-4588
Email: fqvinluan@yahoo.com

*Attorneys for the Plaintiffs*

## VERIFICATION

STATE OF NEW YORK )
COUNTY OF QUEENS  ) S.S.

WE, ISIDRA B. TUBURAN and WENDOLEN O. ALMONTE, both of legal age, and residents of the state of New York, after having been sworn in accordance with law, hereby state that we are two of the named plaintiffs in the within Action/Complaint. Each of us has read the foregoing complaint and knows the contents thereof.   The contents are true to our respective individual knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, each of us believes them to be true.

_____
ISIDRA B. TUBURAN

_____
WENDOLEN O. ALMONTE

SUBSCRIBED AND SWORN to before me this _24th_ day of November 2012.

_____
Notary Public

FELIX Q. VINLUAN
Notary Public, State of New York
No. 02VI6129101
Qualified in Nassau County
Commission Expires June 20, 2013

## VERIFICATION

STATE OF NEW YORK )
COUNTY OF QUEENS ) S.S.

I, ROSALINA D. QUILARIO, of legal age, and a resident of the state of New York, after having been sworn in accordance with law, hereby state that I am one of the plaintiffs in the within Action/Complaint. I have read the foregoing complaint and know the contents thereof. The contents are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

_____

ROSALINA D. QUILARIO

SUBSCRIBED AND SWORN to before me this 25th day of November 2012.

_____
Notary Public

FELIX O. VINLUAN
Notary Public, State of New York
No. 02VI6129101
Qualified in Nassau County
Commission Expires June 20, 2023 13